Good morning, Stephen McCousis on behalf of the Appellants and Defendants, Cross Town Cab Company and Abdul Zaheer Bukhatab. Please spell your last name. M-I-K-U-Z-I-S. Thank you. Good morning, your honors. Courtney Anway, A-N-W-A-Y, attorney for Appellant Rule Transfer, Inc., intervening party with the appellant number of 112539, which is then subsequently consolidated with 111607 and 110428. Good morning. Good morning. John Horahan, counsel for Appellees and Cross Appellants, Santorini Cab Company and Savas Cicerites. Thank you. I notice there is a third party there. Normally our time restrictions were going to wait at this point. Thank you. If you're ready, we'll have your opening statement. Regarding timing, time restrictions are completely waived at this point? I don't expect to take more than 20 minutes in total. We're going to trust that you will appreciate the court's time, but we do intend to give you your day. Thank you. In May or April of 2007, my client, Crosstown Cab Company, and Abdul Abuketab, who I will collectively refer to as Crosstown Cab Company or Abdul throughout this argument, entered into a medallion sales contract with the plaintiff and appellee, Santorini Cab. The contract was for the sale of six taxicab medallions. Now, taxicab medallions are a highly regulated license, and you could also consider them in this day and age a commodity. There's a limited number of these licenses, and their prices have greatly fluctuated. At this point, they continue to go up and up in value. Because of the fluctuation in their value, they're bought and sold as though they are a commodity. After the contract was issued or signed, there are certain points and different documents that have to be filed with the city. The actual closing process associated with the sale of a taxicab medallion is highly regulated. Because the medallions may be subject to different taxes and fines and parking tickets and everything else, the city has a vested interest in ensuring that when a taxicab medallion is sold or transferred, that it is paid what it is owed before the transfer goes forward. In this case, the sale was never consummated. The closing never went through. In September of 2007, loans that were existing on the medallions in question were refinanced by the intervening petitioner, Rural Transfer Incorporated. In January of 2008, a complaint for specific performance was filed against my client by Santorini Cab. Two years later, after a bench trial, the court entered a judgment of specific performance in favor of Santorini Cab. It is our position that the trial court erred in entering such judgment, and that judgment was against the manifest weight of evidence that was offered at trial. Our second argument is that Santorini Cab was not ready, willing, and able to perform at the time that the contract was signed or throughout the transaction history. Regarding the trial court's decision being against the manifest weight of the evidence, we really looked at two points, and the first is the trial court's interpretation of the contract itself, and secondly, the conduct of the parties rather than the actual testimony of the parties. Regarding the contract itself, the key issue at trial was whose duty it was to submit a bulk sales notification to the City of Chicago Department of Revenue. Now, the bulk sales notification is a very important document when it comes to taxicab medallion transfers. As I had stated before, or at least alluded to, the City of Chicago has to agree to a sale of a taxicab medallion. Before they will agree to allow someone to purchase a medallion or transfer a medallion, they want to make sure that whatever the City is due from the previous owner is paid in full. The bulk sales notification, once it's submitted to the Department of Revenue, triggers an audit. The Department of Revenue then audits the seller and determines what is owed to the City. The type of charge that could be owed to the City include charges associated with the taxicab medallion itself, such as ground and transportation taxes, parking tickets, and other fines. However, it also encompasses other things associated with the seller. It could include, if the seller owns real estate, the failure to pay a water bill, or a ticket for a building code violation, things of that nature. Regardless, once the Department of Revenue gets in and performs the audit, whatever the audit results are, that has to be paid before the City will certify the sale. The contract itself was drafted by an attorney who represented Santorini Cab by the name of Bernard Block. Bernard Block gave significant testimony, and his testimony appears to be relied on by the trial court in rendering its decision that my client, as seller, was responsible for turning in and preparing this bulk sales notification and forwarding it on to the Department of Revenue. Mr. Block testified that paragraph 1D of the Medallion Sales Agreement requires that the seller actually submit this bulk sales notification. 1D states as follows. Seller shall be responsible for clearing city ground transportation taxes and parking tickets on said medallions, and shall provide the original clearance documents to purchaser at the time the transfer documents are tendered to purchaser. If purchaser advances any funds to obtain said clearances, said amount shall be reimbursed through deduction from the purchase proceeds. 1D only deals with who is supposed to pay the city. It basically says that the seller is obligated to clear the medallions for sale. If parking tickets are owed, if there's outstanding ground or transportation taxes, the seller is responsible to make these payments. In the event the seller can't make the payment, the purchaser can basically front the money and be paid out of the closing proceeds. That's what 1D says. At trial, trial counsel for the defendant and the appellant argued, my client, excuse me, argued that 1A controls the day as far as who is responsible to submit documents to the city, including the bulk sales notification. 1A states clearly, and it's in bold type, purchaser shall submit all required items for transfer of the medallions to the City of Chicago within a reasonable time hereof. The document's on page 90 to 92 of the record, excuse me, 93 of the record. Based on the clear verbiage of the contract, it's pretty clear that 1A controls the day obligating the purchaser, Santorini Cab, to submit the bulk sales notification to the city. Now Bernard Block testified completely contrary to this point. He testified that it was the seller's obligation. But let's put Bernard Block's testimony aside and actually look at the actions of the parties in the underlying transaction, because I really think that's what was important and that's what the trial court really should have looked at in addition to the wording of the actual contract. Let's talk about bulk sales just for a minute. I'm viewing the bulk sale as just being a clearing document whereby the seller gets everything together, gives it to the purchaser, and then the purchaser perhaps submits it. But the purchaser can't submit it unless the seller gives him everything he needs. Well, there's much more involved in a transfer package aside from the bulk sales notification. But as far as the bulk sales notification itself, it's essentially, it's really just a routine form. If you look at the actual form itself, the only information that has to be provided is the identity of the purchaser, the seller, some very basic, I mean publicly known information about each entity, and then a signature by the actual person who files the document. Municipal statute says that either party can actually submit the bulk sales notification. I guess the question is which party would possess the necessary documents to effectuate the transfer notification? The actual bulk sales notification? Well, yes. Well, the information that's required to submit the bulk sales notification requires information from both parties. It requires information regarding the buyer that may only be known to the buyer prior to the transaction moving forward. It also requires information from the seller that may only be known by the seller. The document is part of the record as pages 207 to 208. In this case, the bulk sales notification was supposedly filed by Bernard Block, the attorney for Santorini Cab. In essence, with his filing of the bulk sales notification, his conduct was in accordance with the interpretation of the contract that we espouse. Now, the testimony of Bernard Block when it came to the bulk sales notification and what exactly happened is a little hazy. The trial counsel made no objection that it was speculative, but he testified that he wasn't sure if he prepared the document or if someone from his office prepared the document. He wasn't sure if he walked it over to the city himself or someone from his office walked it over to the city or if they mailed it or faxed it. But he does claim that when the bulk sales notification was submitted, it was rejected by the city. It's our contention that the... Now, he claimed it was rejected by the city because Crosstown Cab owed the city too much money. It's kind of an absurd statement. The bulk sales notification triggers an audit so the city can gather exactly what the seller, Crosstown Cab and this company, owes the city. It's the first step to the city being paid. If the bulk sales notification is submitted, the audit documents are produced, both parties know how much the seller owes to the city, the city is one step closer to actually getting its money without having to go through a foreclosure process or anything. They're going to get paid out of actual sale proceeds. The fact that the city would reject it because too much money is owed is absurd. What is possible, however, is that the city may have rejected the bulk sales notification because it's incomplete. Frankly, it's sloppy. It's not dated. It's noted that it's date of notice July blank 2007. The exact date is not there. The FEIN number for Crosstown Cab is not included. There's very little information provided regarding the seller. Speaking outside the record, this is a practical matter. When you're dealing with the city, the state or the county, if there's a routine form that has to be submitted for them to accept it, it usually has to be complete. And that's not what we have here. We have a document that was incomplete that was submitted to the city. But as a practical matter, isn't the seller responsible for paying the taxes and the parking tickets? And must those things be done before the purchaser can submit the transfer information to the city to transfer the medallions from the seller to the purchaser? It's true that under the contract that the seller was responsible, in this case, to pay off the taxes and the fines and everything else. And that's controlled by Paragraph 1D of the contract. However, Paragraph 1D also added the caveat. If the seller did not have the ability to make those payments, that the purchaser could make those payments with that fronting of money basically being given back to the purchaser out of the closing proceeds. But the seller has some things to do that are conditions proceeding to the purchaser submitting that transfer document to the city, correct? And you're saying, no, that's not the case. What I'm saying is that the very first thing that has to occur in order for this transaction to move forward is for this bulk sales notice to be submitted to the city, regardless of which party submits it. It's a routine form. Now, once that, without submitting the document to the city, there's no way that the sale will go forward. Now, my client did have other, the seller did have other obligations and had to do other things in order to move the transaction forward. And there was testimony given that he did what he was told. Bernard Block, I mean, based on the testimony he offered, was really controlling the situation and handling the transaction. My client had to produce hard cards for his existing cabs, city stickers and titles of the vehicles. All of those were forwarded on to Bernard Block. Bernard Block, as he indicated in his testimony, took the lead in preparing the other documents that were required as part of the transfer package, of which none of those appeared to have been produced, which actually leads me to my second point, that Santorini Cab was not ready, willing and able to perform. No escrow money was held. Santorini Cab had forwarded no escrow money on to Bernard Block to pay for the transaction. None of the additional documents that were required for transfer appeared to have been prepared by Mr. Block or Santorini. No letter of intent was prepared. The Medallion Settlement Agreement was not prepared. A list of corporate officers for the buying entity with their Social Security numbers and their stock numbers. No affidavits regarding the exempt status of corporate officers regarding workers' compensation. The Medallion Disclosure Form Agreement was not prepared. No steps were taken to actually complete the transaction. And there's one other point I'd like to bring up as well. If you look at the testimony, and it appears to have been disregarded by the trial court, Bernard Block also represented the interest of rule transfer, the intervening petitioner. Months after this transaction, after this contract was signed, Bernard Block assisted rule transfer in assuming liens that were currently on Crosstown Cab. If Santorini and Bernard Block really believe that this transaction is going to go forward, if Santorini is really ready, willing, and able to perform, why is their attorney assisting a third party to purchase liens on medallions that are about to be sold? Again, the party's conduct just doesn't make any sense. On that basis, we ask that Your Honors reverse the trial court's decision granting specific performance, and the alternative, remand the case back to the court, asking the court to hold that the bulk sales notification pursuant to the contract should have been submitted by the purchaser and not the seller, and to rule accordingly. Thank you. Thank you. Again, my name is John Horahan. I represent Santorini Cab Company and Mr. Tsitsiridis, appellees and cross-appellants in this matter. This is a case about a valid, binding, enforceable contract that was clear and definite in its terms and unequivocal. That was the finding of the trial court, and there is nothing in the record that contradicts that finding. In fact, the trial court also found that the parties opposing the plaintiff's claim for specific performance were not credible, that their testimony should not be believed regarding the facts they purportedly put in the record to support their position. With respect to the two issues raised on appeal, I'll address the second one first. In order to prove that my clients were not ready, willing, and able, in order to establish that argument on appeal, counsel must first establish that we abandoned the contract in some way. In fact, he argues that Mr. Block was in control of the transaction, that he was the one driving the transaction. The court found that there was nearly daily contact between Mr. Aboukatab and Mr. Block regarding this transaction. There's no evidence in the record to ever suggest that there was an abandonment of the transaction, rather that Mr. Aboukatab, as he testified to, disputed with the city the amount he would have to pay to clear these medallions and other debts that he and his other companies had with the city of Chicago. That was the reason he wasn't closing the transaction. He had an active, ongoing dispute with the city about the amounts that he owed, not only for Crosstown Cab Company, but for his other interests. The court recognized that, put it in its order, and found that he was the one who refused to perform here. The court also recognized the distinction that I think Your Honors hit upon with respect to a clearance and a transfer document. The clearance is in the interest of and the obligation of the seller in this transaction. And in order to clear those medallions, that seller has to submit a bulk sales notification to trigger that audit by the city so they know how much money the city wants paid, not only for Crosstown Cab Company, but for all other obligations to the city and in other regards, so that the transfer process can then move forward. Until that happens, there isn't a transfer. There can't be a transfer. There can't be transfer documents submitted to the city because no one knows how much money the city is going to pay. Mr. Abuketow testified he knew and was in contact with the city about what it would take to clear his medallions. He never testified that he cleared those medallions. He never presented any proof or evidence at trial regarding payments made to clear the medallions because he didn't want to do it. And the court, getting to the substance of the matter, then recognized that the later loans that counsel mentioned in September of 2007, those loans were taken out supposedly by Crosstown Cab Company in encumbering medallions. Counsel argued those loans refinanced existing debts that encumbered these six medallions. However, there is nothing in the record with respect to the $480,000 loan documents that were dated September 27, 2007, to show that it ever existed, that the loan was refunded, that the loan was ever paid, who was paid, or that any obligation was paid that existed at the time of my client's contract that was secured by these six medallions. In fact, there's no testimony to that effect and there's no document to that effect. Counsel argues it but cites nothing in the record in his brief and cannot cite it because it does not exist. For that reason, for those reasons, the trial court was correct in finding, one, that my clients were ready, willing, and able to close this transaction, found that specific performance was the appropriate remedy and ordered so, and did not find the testimony of these witnesses credible in interpreting the obligations of the parties under the contract and understood those obligations. For those reasons, we believe the court should affirm the judgment of specific performance and if it pleases the court, I'll address our cross-appeal arguments later in oral argument. It's fine. Thank you. Counsel. If it pleases the court, again, I am Courtney Anway. I'm representing the Appellate Rule Transfer Inc. on basically the intervening lender in this matter. Some of the statements that our counsel said I just want to address, there is testimony in the record regarding the loans from rule transfer. The contract itself actually acknowledges the issue of debt by a predecessor of rule transfer. The contract itself mentions the progressive credit union debt and then also mentions an additional third party, which never was addressed at trial. Your Honor, so this is what happened in this matter. The parties obviously have a dispute over a sales contract. My client, rule transfer, lends to cab medallions. As counsel said, they are a commodity, so there are a various amount of lenders which lend. There was originally on these medallions, I guess, debt that was owed by an American country finance, referred to in the record as checker, and then a second set of loans by a progressive credit union. Within the record, the loans are specifically discussed. There is a question which addresses these payoffs from Mr. Abukatab himself. On page 17 of the second day of trial, on line 24, a question is asked of Mr. Abukatab. So adding together the rule transfer loan of $300 that paid off progressive and the $480, you had nearly $780 in debt secured by those Crosstown medallions, correct? Mr. Abukatab goes on to clarify the issue. He says, no, that's not. There was $480 against Crosstown, an additional $300 against a whole bunch of medallions. Additionally, under the testimony of Lev Wolinsky, the president of Rule Transfer, Inc., it clearly lines out in the trial testimony the assumption of these loan documents. If we go to page 54 of the second day of testimony, there's a question asked of Mr. Wolinsky. Okay, this is on line 9. It says, prior to discussing this further, we'd like to talk. You said you paid yourself off. Did you have prior loans between yourself and Crosstown Cab Company? Answer, yes. And how did the loan come about? I got an assumption from Checker. In testimony prior, they had agreed to call American Country Finance Checker. Okay, then when you say Checker, would it be fair to say that you mean American Country Financial Services? Yes. Did you recall on or about the date that you did that? It was either in 05 or 06, I'm not sure. I'm not going to admit this into evidence, but here's a document that you'd like to recognize. Do you recognize that document? Yes, it said. Does this document purport to be where the loan funds were disbursed to you? Yes. So it appears you paid yourself, question, as a signee of American Country Finance Services $332,344.24. The answer to that question was yes. So there's clear records, and there's other examples as well as cited in the appellate brief, which I won't go into in front of the court because it's in the brief itself, that these loans were discussed. Where the money came from was discussed, that it was preexisting debt. Now, the issue that's in front of the court today is the overreaching of the court itself is the first issue. One, that the court adjudicated that loan rule transfer did not act in good faith, quote, unquote, in the order. Was your client acknowledged as an encumbrance in the sales contract? My client specifically was not, but the progressive credit union, the primary lender which he steps in the shoes of for a portion of this debt, was specifically named in the sales contract, Your Honor. Because rule transfer took an assignment of that $300,000 loan. Correct, Your Honor. Any of the apportions paid off, and that was assigned to them. In addition to another preexisting loan. So there's two loans that these Crosstown medallions, six medallions, were partially secured in. The first originated by American Country, which was Checker. That was started by American Country Finance in 01. Then in 05 or 06, as the testimony states, additional loans were given for progressive. Now these progressive loans were paid off in the subsequent loan in September. It was a debt that was assumed after the sale. But the loans themselves were existing and on the books and debt was owed well prior to entering into the sales contract. So by the issue of subrogation, my client rule transfer, no matter when the loan and debt is assigned, should step into the shoes of the primary lender that they paid off. And so in that sense, I feel that in the record, the court overstepped its boundaries by saying that rule transfer acted in bad faith. First off, none of the parties ever pled elements of bad faith, which is actually contrary for saying not in good faith. The defendants themselves never argued the loans or disputed the loans within this case. At testimony, they acknowledged that the loans existed. They acknowledged that the debt existed. And no one pled in their pleadings, either in cross-claim or affirmative defense, against the intervention of rule transfer that disputed these loans in the pleadings themselves. Was rule transfer aware of the obligation between plaintiff and defendant that entered into a contract and then rule transfer, after they knew that, that they didn't loan them for more money? Bernie Block was the attorney for both rule transfer as well as the seller-setter meeting. So the attorney himself was aware of the contract. There's testimony that rule transfer itself partially could have known that the contract had been entered into, but because of the delay in time, there was an assumption that it was not moving forward. Therefore, their attorney suggested, Bernie Block, again, the attorney for Santorini, and there's testimony to this fact that they secure these additional debts. So that testimony regarding Mr. Block came from Love Wolf Wiki. He says, that's on page 35, line 1 of the second date of trial transcript, that you took an assignment of that loan, correct? Yes. Which means you paid it off? Yes. And you paid off $298,000. Wait. And you paid the $298,000 to pay it off? Yes. Now, at the time, you also entered into another agreement with Crosstown and Bucatub. Yes. This loan was for another $480,000. So rule transfer did loan Crosstown more money after they knew that there was a sales contract in it? There was a refinance and restructuring of the debt. An agent of rule transfer had prior existing paid off the American Country Checker. So there was a consolidation of both the American Country Finance and the progressive that was recently obtained. And then in a portion, not the majority of the loan, additional funds were lent. So it was a consolidation of two loans and a refinance, plus a small portion, not the majority of the loan, whereas additional funds. The record is, again, constantly have to be corrected by the deponent. He continues to say, no, it was not another $480,000. Again, this is on page 35, line 14 of the second day of testimony. He already owed me money personally. Mr. Bernie Block was my attorney at the time. He advised me not to use my personal name but to use the corporate entity. So I did the loan, you know, in rule transfer. So on advice of the attorney. So if, in fact, then this second loan that Crosstown entered into, would that not then block this deal from going through? Because now there's more money owed than the plaintiff is willing to buy for the money, than the plaintiff is willing to purchase the bedallions for. I understand there's a complexity with what was entered into and the loan that was given. Again, the loan itself was just a consolidation of the existing debt, plus a small portion of additional funds and fees. That the obligation to pay off the debt is on Crosstown and Abucatow. Whether or not they agreed to the sales price was satirating. Rule transfer was not directly involved in negotiating a sales price. They may have come from outside funds. The record is empty on that fact as far as how the loan would be paid off. That the existing debt already, prior to the small portion of additional funds lent, the existing debt from American Country Finance and Progressive already was over the amount that the bedallions were sold for. So could one possibly think then that the second loan was not made in good faith? It was solely just a refinance of the debt, a pre-existing debt. So subrogation should step in for the portion that went to the prior debt. Maybe the court could say the limited portion that was over and above that pre-existing debt may not have, should have been done, but the lender was securing their primary position. There were payoffs that needed to be made. Taxes and different things for which the parties agreed to give this additional funds to secure their debt that they already had. They already had a progressive first. They already had the American Country. So just as many refinances, if taxes need to be paid or anything else needs to be paid, sometimes a loan amount is increased just like on a mortgage on a home to secure the first lien position. And that pre-existing debt, whether or not additional debt was added, should always be superior and paid off to the rights of a contract. Additionally, the same attorney for the purchaser advised the lender to enter into this new debt. And that is instance and should be seen as a belief that this sales contract wasn't going forward as Crosstown claims, that there was a delay. There was no intention for Saturday to move forward with the sale, but for maybe the increase in value of the medallions, because these medallions were sold at 87 or contracted and then subsequently by court order sold for only 87.5 per medallion. At the time they were sold, obviously a substantial time after litigation, those medallions each were valued upwards of $300,000 each. So you can see here how a party, and again this is from a little transfer, just a lender's opinion coming out there, a party that entered into a contract may have not had any intention of moving forward, but for the increase of pricing, and then the attorney even for that party, this buyer, his own attorney said, go ahead and lend, lend to Crosstown. Not wait, I'm going to advise you, don't lend additionally, because there's a contract that's functional and moving forward that may hamper your loan. Or the sales price in and of itself that I'm aware of doesn't even match the burden of the debt. There's no testimony to that occurring. There's no testimony to those options. So with that, Bernie Block was the same attorney for rule transfer as for Santorini. There's many questions that a trial testimony did not address, even though there is bits and pieces that discuss the existing of prior debt, the knowledge that at least a progressive loan was out there, as well had a little bit, like we do in homes, title search has been done, there were UCCs out there for American country finance, and testimony was that was Checker, and that of Wolkovicki, an agent of rule transfer, assumed that as well. And by advice of the attorney for the seller and himself, shortly after entering the contract, consolidated those debts into a corporate name, rule transfer. And that's the testimony that we have in front of us. So it's the position of rule transfer that the court overstepped. One, that they were only asked to adjudicate a priority, not an issue of good faith or bad faith, that no one asked for that. The only person that asked for any relief regarding rule transfer was rule transfer themselves. They asked that the injunction of May 11, 2008, be lifted, so that they may go forth and continue foreclosure proceedings that they had started at the city level. And that it was for then the city to determine, just like a foreclosure court, because this is the process of taxidermy medallion foreclosures, to determine who had an interest, what the valid debt was. But instead, the court overreached. They, instead of just determining a priority, decided upon themselves to determine an issue of good faith or bad faith, without any parties pleading to that, any parties raising the issue in their pleadings themselves. Now there may have been things that were pointed out in testimony that later after the fact may have consolidated an argument that elements could have been given to the trier of fact, but the actual request of relief was not there. And the manifest weight of the evidence presented at trial was not there. I have no further statements from the court. Any other questions, Your Honors? Thank you. Thank you very much. Again, John Horahan for Santorini Cab Company and Mr. Tsitsiridis. Counsel has referred to many things that are not in this record. There is nothing in the record about a debt existing at the time that the parties entered into the contract, other than the progressive loan. That was disclosed in the contract by the seller. There were some other disclosures as well. No disclosure was ever made about a $300,000, a $400,000, a $480,000 additional obligation of the seller that was encumbered by a security interest in the six medallions that were the subject of this contract. In fact, the court found that to be completely not credible, that no rational person in good faith in September of 2007, knowing the contract price of $87,000 per medallion, knowing the credit history of this seller, would have won, assumed, or taken on an assignment of the progressive loan, let alone adding new lending or refinancing an existing loan agreement for $480,000 of additional money. The court found that to be completely not believable, that they did this for a proper purpose to perfect an existing set of liens, not only for the $300,000 that was known and encumbered these six medallions, but also additional loans that the intervener claims were also secured by the six medallions. There isn't a single document in the record. There wasn't a single UCC financing statement presented in evidence at trial. There wasn't a payoff letter presented in evidence at trial. There was nothing to support the existence of this claim security interest that exceeded the value of the medallions according to the contract price. So you would argue that this was the basis for the court's finding of bad faith? Well, the court, bad faith or not in good faith, that you can't claim the right to foreclose a security interest when you did not in good faith extend the credit that you're now using as the basis for that claim. You're stopped from claiming priority over a contract you knew about. You knew. Mr. Wolkowicki testified he knew about the sales agreement long before these September transactions. He testified clearly about that. He testified he knew about the bad credit history of this seller, and yet the court was expected to believe that not only would he assume an existing loan for $300,000, which would be more than adequately paid off by the sales price, but also that he loaned $480,000 of additional funds to be secured by these medallions. The first security agreement produced and the only one produced at trial in evidence regarding this $480,000 loan secured by these medallions is the one recorded in September of 2007. There is not a single bit of evidence in evidence about a security interest in excess of the progressive loan or in addition to the progressive loan that was known at the time the contract was entered into. That's why the court found this to be unbelievable, and it made sense, because if prices as counsel have contended were going up, what's the best way to get a better price than the $87,000 per medallion? Make the buyer think these have been leaned up greater than they are, and the only way to get them is I have to pay more money. Or, even better, the buyer will just back away, and we'll find another buyer at a higher price, because now we're many months down the road. We've delayed this closing. As the court found, the seller deliberately didn't perform, had a dispute with the city, as I stated earlier, and deliberately did not perform. The evidence is all there in the record to support the court's findings, not only the findings on credibility but especially the findings on the facts, that there's nothing to support these contentions that are being raised on appeal. For those reasons, we believe that the court's order denying the claim of priority and ordering specific performance is well-founded on the record, well-founded on the law and facts, and should be affirmed. With respect to our cross-appeal, addressing it now, the court found this contract to be clear, definite, and unequivocal. That includes the terms with respect to who pays for our action for specific performance. There could be no simpler, clearer statement. Three simple concepts are included in Section 4. You're saying either the parties would pay or a prevailing party would pay attorney's fees. Did it say that? It did not say that. What it said was the seller may pursue an action for specific performance. The seller may obtain a court order for that. And if it does, it is done at or, pardon me, the buyer may pursue the action for specific performance with a court order. And if obtained, it would be done so at seller's expense. Mr. Aboukatab testified that he has sold many medallions. He has never engaged counsel for that purpose. These are as plain a words as you can use about who's going to be responsible if we have to move for specific performance as the buyer. It's your responsibility. It will be your expense if my client has to obtain an order of specific performance in a court. Doesn't the contract also provide that each party is responsible for their own attorney's fees? Except as otherwise provided in the contract. And we believe that's a very direct statement in Section 4 that clearly says if under this limited circumstance we have to sue to get an order of specific performance, it's at your expense, seller. Otherwise, the parties bear their own fees. There is nothing unique about the words attorney's fees. Yes, the cases do discuss. If you use those words, it is clear, but it's also very clear as written in the contract. There are no magic words here. There's not an inflexible requirement that only to shift fees you must say the words attorney's fees. This seller had a clear understanding from the plain, simple words of this agreement. You don't need to look to the testimony of the parties to understand it. It is, frankly, in the context of legal documentation, it takes away the need to be precise in terms of exact use of phrases and words. It's a very simple statement in English that this party can understand. At your expense. Didn't the purchasers draft this contract? Is that correct? Yes, that was the testimony. Couldn't they have provided for attorney's fees in the event they had to bring an action for specific performance? Absolutely, they could have used those words. But that doesn't diminish the meaning of the phrase that is in Section 4, requiring the seller to pay for an action to obtain an order for specific performance. It's clear. There's no magic to the words attorney's fees. Yes, it is what cases discuss might be preferable or desired, but it isn't a magic set of words or phrases that shift fees. As other courts have recognized in the context of indemnity clauses, just the use of the word duty to defend or obligation to defend suggests and requires that that party with the indemnity obligation must pay attorney's fees and costs. In the McNiff case, the word attorney's fees was not used, yet it was held to mean attorney's fees and costs. Likewise here, the word attorney's fees is not used, but it couldn't be more clear that if we have to go to court, it's at your expense. This seller knew that. He took that risk. The court should have ordered that he pay the attorney's fees, costs, and expenses of the buyers, and we'd ask that this court reverse and remand with instructions to award those reasonable fees and costs. Thank you. First, in a rebuttal to counsel for Santorini's argument, counsel noted that there was daily contact between Mr. Block and Abdul Abuketab of Crosstown Cab Company. Now, informal conversations between the two of them and informal conversations between Abdul and the city of Chicago are no substitute for formally filing the bulk sales notice with the city so that the Department of Revenue can begin the process of actually determining what is owed. Whether or not that will be disputed down the road, that initial step, it does not appear to have been taken. But regarding the funding of the $480,000 loan, that information not being a matter of record, the trial court recognized that there was testimony in its order that there was a $480,000 loan made to the defendant in addition to the refinancing and assumption of the progressive loan by rule transfer. There's one thing that really stands out with everything, and I think it really has to be taken into account by this court. If Santorini did not abandon the contract, okay, if Santorini wasn't ready, willing, and able to perform, why would Santorini's attorney, Bernard Block, turn around and refinance existing loans on the medallions for rule transfer and further encumber those medallions? Why would he put himself in that position? Now, he's the only point of contact here. There was clear testimony from the principal of Santorini, Eusebio Ciceritas, that he was not involved in the transaction, that Bernie Block was at his mouthpiece, Bernie Block was moving forward with the sale. If that's true, if they were still ready to buy these medallions, why would Bernie Block put himself in the position of over-encumbering the medallions in question? As an attorney, I would not want to be in that position. I can't imagine any amount of money that would be worth putting myself in that position between two separate clients. Based on the way the agreement is drafted, it's clear who is supposed to submit the bulk sales affidavit, the purchasers. Based on the conduct of the parties, specifically Bernie Block's actions, preparing the bulk sales notice, attempting to file it with the city, refinancing the progressive loan over the rural transfer, and further encompassing the Crosstown Cab Company medallion in September of 2007, there can really be only one point and one ruling that Santorini Cab abandoned the contract. Therefore, we feel that the order for specific performance should be overturned. Regarding the cross-appeal, regarding the attorney fee provision, it's long-standing case law here in Illinois that we follow the American rule. Parties are not obligated to pay an opposing side's attorney's fees unless required by statutes or a contract specifically stating that that is the case. Attorney fee provisions, fee-shifting provisions, they're strictly construed. As we noted in our briefs, in this case, there is a statement as noted by Your Honor that there's a note saying that everyone's responsible for their own attorney's fees except for specifically provided herein. There's only one point in the contract that specifically states that another side may be responsible for the other's attorney's fees. That is Section 5. It's an indemnification provision, order indemnification provisions. I get sued in a tort, you're going to indemnify me. It's talking about personal injury cases essentially. In that case, you have to pay my attorney's fees. Nowhere else in the contract are those words attorney's fees used, despite the fact the contract requires that those words be used if you're going to try to make a party pay for attorney's fees. The actual verbiage that Santorini relies on for their argument is that the purchaser may require specific performance, seller's obligations hereunder, and seek such in a court order at seller's expense. Seller's expense is what they're hanging on. They want seller's expense to encompass attorney's fees. Nowhere in the contract is seller's expense defined. Bernard Blatt, the attorney who drafted this agreement, was asked at trial what he thought that meant. He did not say it included attorney's fees. He simply reiterated, I forgot his exact language, but he basically restated that very provision with a couple different words. He basically said, yeah, they're responsible for the seller's expenses. Seller's expense could be anything. In our opinion, it could equal the cost of filing the complaint and actually serving the complaint. Case law that we cited in our brief supports that attorney's fees should not be given in this case and that the trial court ruled correctly. The case of Kazi versus Ishmael that we cited dealt with a very similar provision. In the Kazi case, the provision in question stated, in case of any legal action arising out of the above default, the party in violation will be responsible for all costs and consequences. The prevailing party in that case argued that consequences should include attorney's fees. Just as present here, the court found that there was no testimony indicating that consequences should include attorney's fees, nor could they find any reason why they should disregard the American rule and broaden the scope of consequences to include attorney's fees unless it was specifically contracted for by the parties. Look, the attorney who handled this transaction, he testified that he's handled taxicab medallion transfers and sales and refinances for 25 years. The case law that we cited goes back almost 40 years. The American rule is a longstanding rule in this jurisdiction. They wanted attorney's fees. They should have just said it. For that reason, we ask that the trial court's decision denying attorney's fees to Santorini be affirmed. Thank you. Thank you. Hello again, Your Honors. Courtney Anway on behalf of Rule Transfer. I just have one short rebuttal. Your Honor, just for clarification, we're not talking about multiple loans that add up to additional funds of $300 plus $480, as counsel for Santorini has said. We're talking about one. You're talking about the existing loan.  And perhaps some small loan. Correct, Your Honor. In the record, it specifically discusses this progressive loan and gives notice in the record at trial of rules interest. There's a UCC statement that was admitted in Group Exhibit B at trial that discusses a UCC for rule transfer as well as an assignment of the progressive debt to rule transfer. So I just want to make sure it was clear to Your Honors that there is evidence in the record, contrary to Santorini's statement, that there's no evidence within the record. As well, as counsel prior said, the judge does acknowledge the one $480,000 loan. No further for Your Honors. Thank you. Thank you. Your Honor, one point in rebuttal regarding the attorney's fees. The simple meaning of the word expense, if you look it up in the dictionary, is what it takes to achieve a result or goal. Counsel's discussion of the Kazi case and the phrase that was used in there, costs and consequences, I believe that court correctly recognized is very vague. Consequences. That is subject to interpretation. Expense is not. Mr. Bukitab, as the seller, knew exactly what his responsibility would be. The difference between the word cost and expense. Expenses fully encompasses what it takes to achieve the objective or goal or purpose. That can be attorney's fees, costs. That can be filing fees. That can be any other number of things in order to achieve that objective. The definition is fully encompassing of all that it takes to achieve an order of specific performance. That's the dictionary definition of the word. It is not subject to vagary or interpretation. Whereas consequences, as used in the Kazi case, was found correctly to be quite vague as to what is the consequence of a cause of action. Did that mean damages, attorney's fees? It was not precise. Seller's expense is very easily understood by this seller. And for that reason, we believe the court should reverse and remain with instructions to award the reasonable fees and costs. Thank you. Thank you. Thank you all. We will take this matter under advisement. Court is adjourned.